**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| David L. Dilettoso, | ) | No. CV 04-0566-PHX-NVW |
| | ) | |
| Plaintiff, | ) | **ORDER** |
| | ) | |
| vs. | ) | |
| | ) | |
| John E. Potter, Postmaster General, United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

The court has considered Defendant's Motion For Summary Judgment Or Partial Summary Judgment; Memorandum Of Points And Authorities (doc. # 34) ("Motion"), Defendant's Statement Of Facts Supporting Motion For Summary Judgment Or Partial Summary Judgment; Addendum (Exhibit List) (doc. # 35) ("DSOF" and "DSOF Ex."), Plaintiff's Response To Defendant's Motion For Summary Judgment Or Partial Summary Judgment; Memorandum Of Points And Authorities (doc. # 39) ("Response"), Plaintiff's Statement Of Facts In Support Of His Motion For Summary Judgment (doc. # 41) ("PSOF"), plaintiff's Controversion To Defendant's Statement Of Facts Supporting Summary Judgment Or Partial Summary Judgment (doc. # 40) ("CSOF"), plaintiff's Notice Of Errata (doc. # 42), Defendant's Reply To Response Re Motion For Summary Judgment Or Partial Summary Judgment (doc. # 48) ("Reply"), and Plaintiff's Motion To Strike Defendant's Summary Of Remaining Material . . . Advocate For U.S.P.S. (doc. # 49).

1   Plaintiff David Dilettoso brought this action against the Postmaster General (the

2   "government" or "Postal Service"), Dilettoso's employer, alleging that Dilettoso was

3   retaliated against for engaging in protected Title VII activity in violation of 42 U.S.C. §

4   2000e-3(a).   Dilettoso alleges a panoply of discrete instances of retaliation and an

5   overarching retaliatory hostile working environment.   The government now moves for

6   summary judgment or partial summary judgment on Dilettoso's claims.

7   **I.      Background**

8   Dilettoso is a senior manager in the United States Postal Service.  (DSOF Ex. 5 at ¶

9   8; DSOF at ¶ 1.)  Since 1996, Dilettoso has filed against the Postal Service multiple EEO

10  complaints and at least three district court actions.  (Motion at 3-4.)  The circumstances

11  surrounding Dilettoso's first district court action remain relevant to this case.  In that action,

12  filed in 1997, Dilettoso alleged that he was treated differently than other employees due to

13  his sex and race after two subordinates filed sexual harassment complaints about him.

14  (DSOF Ex. 2 at 3:12 to 4:11.)  Ms. Starr, one of the complaining subordinates, alleged

15  specifically that Dilettoso drugged her and then raped her.  (DSOF at ¶¶ 3, 6; Decl. of Paul

16  Harris at ¶ 2.)  The Postal Service independently decided to settle Ms. Starr's case[1] and

17  Dilettoso's action was later dismissed on summary judgment.  (PSOF Ex. K at ¶ 3; DSOF at

18  ¶ 6; DSOF Ex. 3.)

19  The current action arises predominantly out of Dilettoso's interactions with another

20  subordinate, Ms. Ramona Lopez.  Seeking a romantic relationship with Dilettoso, Ms. Lopez

21  began calling Dilettoso in 2001 and called him a total of about 100 times over eight to ten

22  months.  (DSOF at ¶ 13; CSOF at ¶ 13.)  Although Dilettoso told her over the phone to stop

23  calling him, he never formally reprimanded her.  (DSOF Ex. 11 at 67:4 to 68:20.)  After the

24  first three or four months of calls, she stopped calling for awhile.  (DSOF Ex. 11 at 68:9 to

25

26  _____

27  [1] Counsel for Dilettoso acknowledged at oral argument that she believed the Postal Service paid Ms. Starr $150,000.00 to settle the claim.

28

1    69:4.)  When she resumed, Dilettoso sought the advice of Nick Head in Human Resources.

2    (PSOF Ex. C at 69:9-12, 125: 1-9.)  Nick Head told Dilettoso to begin putting Ms. Lopez on

3    the speaker phone when she called in order to allow Dilettoso's superiors to listen.  (*Id.*)

4         In November of 2002, Dilettoso finally asked Dave Carey, Dilettoso's immediate

5    superior, to make Ms. Lopez stop calling.  (DSOF at ¶ 17; CSOF at ¶ 17.)  When confronted

6    by Carey, Ms. Lopez alleged that Dilettoso had been sexually harassing her and had engaged

7    in sexual intercourse with her.  (CSOF at ¶ 18.)  Dave Carey determined that Ms. Lopez was

8    lying and testified in his deposition that Ms. Lopez explained to him that she was in love with

9    Dilettoso.   (PSOF Ex. B at 63:16-64:7.)   Nevertheless, the Postal Service began an

10   investigation into the sexual harassment claim.  (DSOF Ex. 13 at 15:9-23.)

11        During that investigation in January of 2003, Michael Leist, a subordinate of

12   Dilettoso, independently came forward with additional allegations against both Dilettoso and

13   Ms. Lopez.  (DSOF at ¶ 22; CSOF at ¶ 22.)  Although neither party before the court submits

14   evidence as to what specifically Leist alleged, the parties do agree that Leist alleged that

15   Lopez had previously stabbed Leist with a screwdriver.  (CSOF at ¶ 24; DSOF at ¶ 24.)  Leist

16   also testified that he feared Dilettoso and that he believed Dilettoso disliked him and

17   subjected him to heightened scrutiny on the job.[2]  (DSOF Ex. 16 at 34:17-25, 35:1-9, 58:9-

18   18.)  Due to the nature of Leist's allegations, Mr. Garrison, a superior of Dilettoso, felt that

19   Leist and Dilettoso should not be working in the same building during the pendency of the

20   Dilettoso investigation.  (DSOF Ex. 13 at 49:12-17.)  Garrison and Paul Harris, another

21

22

---

23        [2] The government's statement of facts suggests that Leist alleged fearing for his life

24   from Dilettoso, but the government has not provided a pincite to page or line numbers of the
     deposition testimony referenced in support thereof and may have failed to include the

25   appropriate pages.  (DSOF at ¶ 22.)  Dilettoso denies this suggestion and purports to present
     evidence that Leist was not physically afraid of Dilettoso.  (CSOF at ¶ 22.)  Dilettoso also

26   fails, however, to include the deposition pages cited.  (*See* (absent) PSOF Ex. H at 72.)  The

27   court does not rely on either party's unsupported assertions on this motion.

28

1   superior of Dilettoso, conferred and decided to place Dilettoso on administrative leave with

2   pay beginning on January 10, 2003.  (DSOF at ¶ 28; CSOF at ¶ 28.)

3       Dilettoso remained on paid administrative leave for over nine months, until October

4   27, 2003.  (PSOF at ¶ 18.)  Ms. Lopez, who had also been placed on administrative leave

5   beginning around the same time as Dilettoso, was permitted to return to work four and one-

6   half months earlier than Dilettoso, on June 4, 2003.  (PSOF at ¶ 19.)  Dilettoso did not

7   receive a $1,000 bonus for the period of time he was on leave.  (DSOF at ¶ 74(1).)

8       Aside from being placed on leave and kept on leave for so long, Dilettoso alleges a

9   laundry list of other retaliatory conduct, including (1) that he was not informed that his prior

10  application for the position of Peoria Postmaster had been denied, (PSOF at ¶ 42); (2) that

11  a Postal Service attorney used Dilettoso's administrative leave as a ground for impeaching

12  Dilettoso while Dilettoso was testifying in an unrelated matter, (PSOF at ¶ 45); (3) that

13  coworkers spread rumors and shared confidences about him; (4) that the Postal Service

14  disseminated lies about him; (5) that he was used as a "guilty example" in training; (6) that

15  Post Service officials wrote letters about him assuming he was guilty without personal

16  knowledge thereof; and (7) that Paul Harris, one of his supervisors, would not speak to him.

17  (PSOF at ¶ 74; CSOF at ¶ 74.)

18      Dilettoso's central grievance, however, is that the Postal Service malevolently placed

19  Dilettoso on paid leave and perpetuated the investigation into Ms. Lopez's allegations as an

20  excuse to keep him on leave.  According to Dilettoso, Garrison repeatedly called for further

21  investigations even after Ms. Lopez's allegations had been fully debunked.  Dave Carey's

22  preliminary investigation, for instance, ended with a conclusion that Ms. Lopez had lied.

23  (PSOF Ex. B at 63:16-64:7.)  Then Garrison ordered a "fact finding" by Murrietta Penn and

24  Andy Graves, who reported their conclusions on February 27, 2003.[3]  Later, the Pacific Area

25  _____

26      [3] Although Dilettoso states as fact that this second investigation found no
    substantiation for the claims of sexual harassment of Lopez by Dilettoso, the cited evidence

27  does not support this assertion.  (Response at 3; PSOF at ¶ 11.)

28                                    - 4 -

1   office assigned David Beauvais and Jennifer Angelo to investigate Mr. Leist's complaints

2   against Dilettoso.  Finally, Bob Slider was retained to perform an investigation.

3         The government explains that in light of the previous sexual harassment and rape

4   allegations against Dilettoso, a "fact finding" was appropriate when additional sexual

5   harassment charges were made.  The decision to place Dilettoso on leave was made after

6   Leist came forward on his own initiative during that "fact finding" with further allegations

7   against Dilettoso.  (DSOF Ex. 13 at 49:12-50:7; Ex. 17 at 88:3-17, 89:17-23.)  The "fact

8   finding" left open questions particularly with respect to Leist's complaints, so the Pacific

9   Area performed a supplemental investigation.  (*See* DSOF Ex. 23-40; Ex. 33 at 292.)  The

10  Pacific Area's supplemental investigation cleared Dilettoso on the sexual harassment issue

11  but left open the question of whether Dilettoso had engaged in consensual sexual intercourse

12  with a subordinate and then lied about it during the investigation.  (Motion at 15-16.)  When

13  exculpatory evidence was presented on that issue, Bob Slider was retained to verify the

14  evidence.  (DSOF at ¶¶ 61-62.)  After confirmation by Slider regarding the exculpatory

15  evidence, Dilettoso was brought back to work.

16  **II.    Plaintiff's Motion To Strike**

17        Dilettoso moves to strike various arguments, facts, and evidence submitted by the

18  government on this motion.  The court addresses the motion with respect to evidence first

19  and then addresses the arguments and facts.

20        **A.    Motion To Strike Evidence**

21        "It is well settled that only admissible evidence may be considered by the trial court

22  in ruling on a motion for summary judgment."  *Beyene v. Coleman Sec. Servs.*, 854 F.2d

23  1179, 1181 (9th Cir. 1988).  Dilettoso moves to exclude Exhibits 6, 7, 8, 42 and 31, as well

24  as Exhibits 24-30.

25

26

27

28

1          **1.      Exhibits 6, 7, 8, 42 And 31**

2          Dilettoso argues that Exhibits 6, 7, 8, 42 and 31 were not admissible for the purposes

3  for which they were used given lack of personal knowledge.  Dilettoso's objection to Exhibits

4  6, 8, 42 and 31 are moot because the court has not relied on them in deciding this motion.

5          Exhibit 7 is the deposition transcript of Dilettoso.  (DSOF Ex. 7.)  The government

6  relies in its motion for summary judgment on Dilettoso's testimony that Ms. Starr claimed

7  Dilettoso had drugged and raped her in a bar parking lot (DSOF Ex. 7 at 38:12-13), and that

8  Dilettoso was a manager at the Postal Service in 1996.  (DSOF Ex. 7 at 9:3-20.)

9          Federal Rule of Evidence 602 states that a "witness may not testify to a matter unless

10 evidence is introduced sufficient to support a finding that the witness has personal knowledge

11 of the matter."  "Personal knowledge" means first-hand knowledge:  "A witness may testify

12 only about matters on which he or she has first-hand knowledge.  The witness's testimony

13 must be based on events perceived by the witness through one of the five senses." *Latman*

14 *v. Burdette*, 366 F.3d 774, 787 (9th Cir. 2004) (citing 3 Jack B. Weinstein & Margaret A.

15 Berger, Weinstein's Federal Evidence § 602.02 (2d ed. 2004)).

16         Dilettoso unquestionably had knowledge of his position at the Postal Service.  Going

17 to work during 1996 would provide Dilettoso personal knowledge of his employment

18 position.  It is also obvious that Dilettoso knew of the EEO complaint filed against him by

19 Ms. Starr, given the extensive investigation performed by the Postal Service related to that

20 charge.  While the exclusion of this evidence would in no way effect the court's holding on

21 this motion, the court is satisfied that Dilettoso has introduced sufficient evidence to support

22 a finding that he had personal knowledge of these matters.  Dilettoso's motion to strike (doc.

23 # 49) with respect to that testimony is denied.

24         **2.      Exhibits 24-30**

25         Dilettoso objects to the government's Exhibits 24-30 on the ground that they are

26 unauthenticated and inadmissible hearsay.  (doc. # 49 at 6-7.)

27

28                                          - 6 -

1    Exhibits 24-30 are properly authenticated.  One sufficient method of authentication

2    according to Federal Rule of Evidence 901 is "Testimony of witness with knowledge.–

3    Testimony that a matter is what it is claimed to be."  Fed.R.Evid. 901(b)(1).  Dilettoso

4    acknowledges that the Exhibits are documents originally attached to a narrative written by

5    Leist and provided to the Postal Service describing events related to Leist's complaints about

6    Dilettoso.  (doc. # 49 at 6.)  When presented with the narrative and attachments, Leist

7    testified that they were mailed to Al Iniguez, the Pacific Area Vice President, by Leist's EEO

8    representative.  (Reply Ex. 43 at 70:2-22.)  Such testimony is sufficient to authenticate the

9    documents as those mailed.  Fed.R.Evid. 901(b)(1).

10   The Exhibits are not hearsay.  Hearsay is an out-of-court assertion offered to prove

11   the truth of the matter asserted.  Fed.R.Evid. 801(c); *Beyene*, 854 F.2d at 1182.  The

12   government does not submit these Exhibits for the truth of the matters asserted in them.  The

13   Exhibits are submitted to substantiate their alleged effect on the Postal Service officials in

14   deciding whether to continue the investigation of Dilettoso.  (*See* Motion at 5:5-8.)

15   Dilettoso also argues that Leist made several versions of his narrative and that some

16   of the attachments to his narrative have never been produced.  (doc. # 49 at 6.)  Aside from

17   the fact that Dilettoso fails to provide evidentiary support for these assertions,[4] such

18   assertions merely provide a basis for the factfinder to disregard these documents as not the

19   ones provided by Leist to the Postal Service.  Evidence nonetheless remains "sufficient to

20   support a finding that the matter in question is what its proponent claims."  Fed.R.Evid.

21   901(a).  The court therefore denies the motion to strike (doc. # 49) with respect to Exhibits

22   24-30.

23

24

25

26   _____

27   [4] Dilettoso cites generally the deposition of Michael Leist without providing page or line numbers.  (doc. # 49 at 6.)

28                                          - 7 -

### B.    Motion To Strike Arguments And Facts

Dilettoso moves to strike various facts and reply arguments of the government.

#### 1.    Facts

Dilettoso moves to strike many of the government's statement of facts as mischaracterizing the evidence or as unsupported by the evidence.  The court has undertaken independent review of the evidence in deciding the motion for summary judgment and has not relied on mischaracterizations of it.

#### 2.    Reply Arguments

Dilettoso first moves to strike from the government's Reply brief "all of  the arguments concerning mixed motive" as not raised in the Motion and "not raised in the Response in the manner in which Defendant asserts."  (doc. # 49 at 7.)  Dilettoso himself broached the issue of mixed motive by arguing in his Response that retaliation needs only to be "a" motivating factor, not "the" motivating factor behind the adverse employment action in order for Dilettoso to prevail, citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) (holding that direct evidence of discrimination is not needed in order to obtain a mixed motive jury instruction).  (Response at 15.)  In the Reply, the government argued that even under a mixed motive standard summary judgment would be appropriate.

Counsel for Dilettoso withdrew the motion to strike on this issue at oral argument.  Although counsel also acknowledged that Dilettoso's Response was inadequate to properly place the issue of mixed motives before the court, for completeness the court analyzes mixed motives theory in Part VII of this order.

Dilettoso also moves to strike three lines from the government's Reply brief that refer to the "enormity" of Dilettoso's alleged misconduct.  The court has not relied on this characterization of the complaint against Dilettoso in deciding the motion for summary judgment.  Dilettoso's motion to strike (doc. # 49) is therefore denied as moot on this issue.

1

## III.     Analysis And Burdens In Title VII Cases

2          Section 2000e-3(a) of Title 42 makes it an unlawful employment practice "for an

3   employer to discriminate against any of his employees or applicants for employment . . .

4   because he has made a charge, testified, assisted, or participated in any manner in an

5   investigation, proceeding, or hearing under [42 U.S.C. §§ 2000(e)-2000(e)17]." On summary

6   judgment "the existence of a discriminatory motive for the employment decision will

7   generally be the principal question." *Lam v. Univ. of Haw.*, 40 F.3d 1551, 1559 (9th Cir.

8   1994).

9          A Title VII case may generally be analyzed under either a single-motive or a mixed-

10   motive rubric. *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1072 (2004).  The court

11   analyzes Dilettoso's claim under a single-motive or "pretext" analysis first and performs a

12   mixed-motive analysis in Part VII.  The burden of proof in establishing discriminatory

13   motive in a single-motive Title VII case is as follows.

14                In order to prevail in a Title VII case, the plaintiff must establish
            a prima facie case of discrimination.  If the plaintiff succeeds in
15            doing so, then the burden shifts to the defendant to articulate a
            legitimate, nondiscriminatory reason for its allegedly
16            discriminatory conduct. If the defendant provides such a reason,
            the burden shifts back to the plaintiff to show that the employer's
17            reason is a pretext for discrimination.

18   *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003) (citations omitted).

19   ## IV.     Prima Facie Case

20          The plaintiff must first establish a prima facie case of discrimination.  "For a prima

21   facie case, [Dilettoso] must offer evidence that gives rise to an inference of unlawful

22   discrimination, either through the framework set forth in *McDonnell Douglas Corp. v. Green*

23   or with direct or circumstantial evidence of discriminatory intent." *Vasquez*, 349 F.3d at 640

24   (internal citations and quotations omitted).  The framework set forth in *McDonnell Douglas*

25   as modified for retaliation cases requires that Dilettoso "demonstrate that (1) []he had

26   engaged in protected activity; (2) []he was thereafter subjected by [his] employer to an

27   adverse employment action; and (3) a causal link existed between the protected activity and

28

the adverse employment action." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005) (citations omitted).

### A.   Protected Activity

The first requirement of the prima facie case is that Dilettoso must have engaged in a protected activity.  The government does not dispute that Dilettoso has engaged in a variety of protected activities.  Dilettoso has, for example, filed multiple EEO complaints and actions.  (*See* PSOF at ¶ 1.)  Nor does the government dispute that Dilettoso's complaints about Ms. Lopez were protected activity.  (Reply at 10:13-15.)

### B.   Adverse Employment Action

Dilettoso must next establish an adverse employment action.  An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000) (citations omitted).  The Ninth Circuit takes "an expansive view of the type of actions that can be considered adverse employment actions." *Id.* at 1241.  Thus, even complete lack of harm to the plaintiff from the employment decision may not preclude a finding of adverse action. *See Hashimoto v. Dalton*, 118 F.3d 671, 675 (9th Cir. 1997) ("That this unlawful personnel action turned out to be inconsequential goes to the issue of damages, not liability.").

A plaintiff must also exhaust his or her administrative remedies related to an adverse employment action in order to properly raise that adverse action in this court. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003) ("To establish subject matter jurisdiction over his Title VII retaliation claim, [a plaintiff] must have exhausted his administrative remedies by filing a timely charge with the EEOC." (citations omitted)).  As part of the exhaustion process, "a federal employee must notify an EEO counselor of discriminatory conduct within 45 days of the alleged conduct, and then, if the matter is not resolved, the employee may submit a formal administrative complaint." *Sommatino v. United States*, 255 F.3d 704, 708 (9th Cir. 2001) (citing 29 C.F.R. §§ 1614.105, 1614.106);

1 *see also* 29 C.F.R. § 1614.103(a) (making part 1614 applicable to complaints alleging

2 retaliation). In determining whether a plaintiff has satisfied this exhaustion requirement with

3 regard to an alleged employer action, the action must be classified as either a "discrete" or

4 "non-discrete" employer act. *See Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir.

5 2005).

6        A discrete retaliatory or discriminatory act "occurs" on the day that it "happens," *Nat'l*

7 *R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 110 (2002), and independently constitutes

8 an adverse employment action. *See Porter*, 419 F.3d at 893 (listing as discrete acts "refusing

9 to grant [plaintiff's] requests for vacation or holidays, requiring [plaintiff] to be tested for

10 tuberculosis by her own physician, threatening disciplinary action while [plaintiff] was on

11 medical leave, leaving a negative performance evaluation in [plaintiff's] personnel file, and

12 instructing [plaintiff] to enter the work site through the back gate"). "[E]ach discrete

13 discriminatory act starts a new clock for filing charges alleging that act." *Morgan*, 536 U.S.

14 at 114. If a discrete act is time-barred, it may not even be used to establish a hostile working

15 environment, although it may be considered for the purpose of placing non-discrete acts in

16 context. *Porter*, 419 F.3d at 893-94.

17        "Non-discrete" retaliatory acts may support a claim for hostile working environment

18 but do not independently constitute adverse employment actions. *See Porter*, 419 F.3d at

19 893. A claim for hostile working environment may be based on unexhausted non-discrete

20 acts "so long as any act contributing to that hostile environment takes place within the

21 statutory time period." *Morgan*, 536 U.S. at 105.

22                          **1.    Discrete Acts**

23        Even at this late stage Dilettoso has failed to clarify which practices of the Postal

24 Service are being alleged as discrete adverse actions and which are intended as non-discrete

25 component parts of his hostile working environment claim. (*See* Response at 6:12-13, 16:22-

26 17:3.) Dilettoso's Response, which incorporates CSOF ¶ 74 – which itself cites sixty-seven

27 "items" – seems intentionally evasive on the issue. The court addresses as discrete adverse

28

1  actions those items specifically relied upon by Dilettoso in opposing this motion: (1)

2  Dilettoso was placed on paid administrative leave and that leave was extended; (2) the Postal

3  Service created and circulated documents containing allegedly slanderous statements; (3)

4  Dilettoso was not informed that he was passed up for the Peoria Postmaster position; (4) the

5  Legal Department impeached Dilettoso while Dilettoso was testifying in an unrelated matter;

6  and (5) one of Dilettoso's supervisors would not speak to him.

7      Dilettoso has not contested the government's calculation of the exhaustion period in

8  determining whether these acts are properly before the court.  Dilettoso first contacted an

9  EEO counselor related to his retaliation charges on February 18, 2003.  (CSOF at ¶ 35.)

10  Accordingly, any discrete employer acts occurring before January 4, 2003, were not

11  exhausted and are therefore time-barred.

12              **i.    Dilettoso's Placement On Paid Administrative Leave And
                        Continuation Of That Leave**

13      Dilettoso argues that his placement on paid administrative leave and the continuation

14  thereof was an adverse employment action.  Dilettoso was placed on leave on January 10,

15  2003, making this claim timely.

16      Dilettoso's placement on paid administrative leave and his continuation on leave

17  during the pendency of the investigation qualify as an adverse employment action.  The

18  Ninth Circuit's expansive view of adverse employment actions "covers lateral transfers,

19  unfavorable job references, and changes in work schedules."  *Ray v. Henderson*, 217 F.3d

20  1234, 1243 (9th Cir. 2000).  Removal from a position that may lead to pay increases can also

21  constitute an adverse employment action.  *See Strother v. S. Cal. Permanente Med. Group*,

22  79 F.3d 859, 869 (9th Cir. 1996).  Here, Dilettoso was placed on administrative leave with

23  pay for nine months, during which he missed an opportunity to earn a $1,000 bonus.

24  Administrative leave is a massive "change in work schedule" and in this case coincided with

25  missed economic opportunity.  Although administrative leave with pay may be welcomed

26

27

28                                          - 12 -

1    by some, the threat of forced leave could reasonably deter employees who prefer working

2    from engaging in protected activity.

3

4                    **ii.    Creating And Circulating Documents Containing Allegedly
                             "Slanderous" Statements**

5            Dilettoso argues that the Postal Service created and circulated slanderous materials

6    about him and that such conduct constituted an adverse employment action.  The document

7    to which Dilettoso refers is a memoranda from Nancy Howe of the EEO Dispute Resolution

8    Department to Garrison describing other cases in which Dilettoso had been involved and

9    drawing analytical parallels with Ms. Lopez's allegations.  (DSOF Ex. 34 (cited in Response

10   at 16:28).)

11           Dilettoso submits no evidence to establish this adverse action aside from the

12   memoranda.  Dilettoso provides no evidence, for example, that this document was distributed

13   in any manner except to Garrison for the purpose of assisting Garrison with his

14   decisionmaking.   Nor does Dilettoso submit evidence that the document contains false

15   statements.  The court need not, therefore, decide whether the Postal Service's creation and

16   circulation of a "slanderous" document would constitute an adverse employment action.  The

17   creation of the document in itself was not a discrete adverse employment action.

18

19                    **iii.   Dilettoso Was Not Informed That He Was Passed Up For
                             The Peoria Postmaster Position**

20           Dilettoso alleges that after applying for the position of Peoria Postmaster General, he

21   was not notified when interviews for that position were scheduled and, contrary to custom,

22   was not informed when he was passed up for the position.  Dilettoso does not suggest that

23   being passed up for the position was an adverse employment action; he takes issue only with

24   the Postal Service's failure to inform him about the interviews and about his non-selection.

25   (Response at 7:7-10; PSOF Ex. K at 4 at ¶ 12.)

26           The government in its Motion argues that these allegations were not properly

27   exhausted.  "The time period for filing a complaint of discrimination begins to run when the

28                                          - 13 -

facts that would support a charge of discrimination would have been apparent to a similarly situated person with a reasonably prudent regard for his rights." *Boyd v. U.S. Postal Service*, 752 F.2d 410, 414 (9th Cir. 1985).  Dilettoso discovered that he had not been selected for an interview in April or June of 2003 but did not contact an EEO counselor about these issues until October of 2003 when he returned to work. (DSOF Ex. 11 at 148:2-8.)  The time period for filing a complaint and meeting with a counselor thus began in April or June and would have expired at the latest in August.  If Dilettoso was required to separately exhaust these employer acts, he failed to do so.

Exhaustion of a prior employer action, however, sometimes excuses non-exhaustion of a later incident.  "Although administrative exhaustion is generally a prerequisite to obtaining judicial review, [the Ninth Circuit has] recognized that forcing an employee to begin the administrative process anew after additional occurrences of discrimination in order to have them considered by the agency and the courts would erect a needless procedural barrier." *Anderson v. Reno*, 190 F.3d 930, 938 (9th Cir. 1999), *overruled in part on other grounds*, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).  Prior counseling will exhaust a later claim "for discrimination that fall[s] within the scope of the EEOC's actual investigation or an EEOC investigation that could reasonably be expected to grow out of the charge." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 644 (9th Cir. 2003); *see also B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1102 (9th Cir. 2002) ("Title VII does not require that the plaintiff separately exhaust additional claims that are so closely related to the allegations made in the charge that agency action would be redundant." (alterations, citations and internal quotations omitted)).

The two alleged actions here required separate exhaustion.  Dilettoso's first complaint, for which he was counseled on February 18, 2003, alleged that Dilletoso was placed on administrative leave in retaliation for Dilettoso's prior EEO activity.  (DSOF Ex. 15 at 1.)  Based on that complaint, the EEO would have no reason to investigate the employees who made Peoria's hiring decisions or the employees who send out notices related to Peoria's

hiring decisions. *See Vasquez*, 349 F.3d at 645 ("Based on Vasquez's [first] charge, the EEOC would have no reason to investigate the employees who assigned overtime work or the employees who decided whether to award bilingual pay."). Nor were Dilettoso's two complaints based on similar factual allegations such that the investigation of the first would uncover issues relevant to the second. *See id.* at 645-46 (holding that Vasquez's second grievance was exhausted because the first complaint alleged "the same acts specified as retaliation" in his second claim). The different decisionmaker involved strongly suggests that agency investigation based on the second complaint would in no way be redundant to agency action sparked by the first.

Because this alleged adverse employment action was not properly exhausted, the court has no jurisdiction over a claim based on the Postal Service's failure to notify Dilettoso of the interview or of his non-selection for the Peoria position. *See id.* at 644.

### iv.    Impeachment Of Dilettoso While Testifying

Dilettoso argues that while he was testifying against the Postal Service in an unrelated matter, the Postal Service's legal department cross-examined him concerning his administrative leave and the allegations made against him by Ms. Lopez. (Response at 7.) Mere questioning does not rise to the level of an adverse employment action. *See Schamann v. O'Keefe*, 314 F. Supp. 2d 515, 530 (D. Md. 2004) (holding that being interviewed does not constitute adverse action where investigators were looking into activities of a third party and did not indicate plaintiff was doing anything improper). Dilettoso has not submitted evidence that the questioning was in any way oppressive or that the attorneys acted improperly during the questioning. Dilettoso's impeachment was not a discrete adverse employment action.

### v.    Dilettoso's Supervisor Shunned Him

Dilettoso alleges that one of his supervisors, Mr. Harris, refuses to speak to him and directs questions to others as opposed to Dilettoso. (PSOF Ex. K at ¶ 4.) "[O]stracism in the workplace is not enough to show an adverse employment decision." *Strother v. S. Cal.*

1  *Permanente Med. Group*, 79 F.3d 859,869 (9th Cir. 1996) (citations omitted); *see also*

2  *Brooks v. San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force

3  employees to socialize with one another, ostracism suffered at the hands of coworkers cannot

4  constitute an adverse employment action." (citations omitted)).  Moreover, "Title VII is not

5  a general civility code for the American workplace." *Porter v. Cal. Dep't of Corr.*, 419 F.3d

6  885, 893 (9th Cir. 2005) (citations omitted).  Mr. Harris's conduct does not rise to the level

7  of a discrete adverse employment action.

8  **2.    Non-Discrete Acts And Hostile Working Environment**

9      A claim for hostile working environment is cognizable under the anti-retaliation

10  provisions of Title VII.  *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000).  Such a

11  claim is actionable only if the harassment "is sufficiently severe or pervasive to alter the

12  conditions of the victim's employment and create an abusive working environment."  *Id.*

13  (citations and internal quotations omitted).  "The required level of severity or seriousness

14  varies inversely with the pervasiveness or frequency of the conduct."  *Nichols v. Azteca Rest.*

15  *Enters.*, 256 F.3d 864, 872 (9th Cir. 2001).  "To determine whether an environment is

16  sufficiently hostile, [the court] look[s] to the totality of the circumstances, including the

17  frequency of the discriminatory conduct; its severity; whether it is physically threatening or

18  humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an

19  employee's work performance."  *Ray*, 217 F.3d at 1245 (citations and internal quotations

20  omitted).  The harassment "must be both objectively and subjectively offensive."  *Id.* at 1245

21  (citations omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless

22  extremely serious) will not amount to discriminatory changes in the 'terms and conditions of

23  employment'" so as to constitute a hostile work environment.  *Faragher v. Boca Raton*, 524

24  U.S. 775, 788 (1998).

25      Authority exists to suggest that discrete acts should not be considered in determining

26  whether a plaintiff has submitted evidence sufficient to establish a hostile working

27  environment.  *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 893 (9th Cir. 2005).  Even

28

- 16 -

including those acts that are discrete, though, Dilettoso's allegations which are supported by evidence do not rise to the level of a hostile working environment.  The allegations of both discrete and non-discrete incidents supported by evidence are: (1) that Dilettoso was placed on leave and remained there while the investigation was perpetuated, (2) that one of Dilettoso's supervisors would not talk to him, (3) that he was cross-examined about his administrative leave, (4) that he was not notified when he was passed up for an interview for the Peoria Postmaster position, (5) that the EEO Dispute Resolution Department created a document about him analyzing similarities between the claims alleged against him, (6) that when he was returned to work he was advised not to place himself in positions with subordinate female employees where accusations might arise, and (7) that Diperi informed him that Diperi was receiving pressure to terminate Dilettoso.

These evidenced assertions do not establish the severity and pervasiveness of harassment present in cases presenting a jury question of hostile work environment.  In *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998), for example, the court found a jury question whether a hostile working environment existed where:

> the plaintiff's supervisor made repeated sexual remarks about the plaintiff over a two-year period, calling her 'gorgeous' and 'beautiful' rather than her name, telling her about his sexual fantasies and his desire to have sex with her, commenting on her 'ass,' and asking over a loudspeaker if she needed help changing clothes.

*Vasquez v. County of Los Angeles*, 349 F.3d 634, 643 (9th Cir. 2003).  Similarly, in *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864 (9th Cir. 2001), the court upheld the factfinder's determination that  a hostile working environment existed where "a male employee of the restaurant was subjected to a relentless campaign of insults, name calling, vulgarities, and taunts of 'faggot' and 'fucking female whore' by male co-workers and supervisors at least once a week and often several times a day." *Vasquez*, 349 F.3d at 643.  Finally, in *EEOC v. Hacienda Hotel*, 881 F.2d 1504 (9th Cir. 1989), the Ninth Circuit:

> affirmed the district court's findings and conclusions following a bench trial that repeated vulgarities, sexual remarks, and

1   requests for sexual favors by a hotel employee subjected female
2   maids to severe and pervasive sexual harassment that seriously
    tainted the working environment and altered the terms and
3   conditions of their employment. Among other things, the chief
    of engineering (Nusbaum) told a pregnant maid "that's what you
4   get for sleeping without your underwear," asked her why she
    was pregnant by another man, and made comments about her
5   "ass." Nusbaum regularly offered to give another maid money
    and an apartment to live in if she would "give him her body"; he
6   assured her she would never be fired if she would have sex with
    him; and told another "You have such a fine ass. It's a nice ass
7   to stick a nice dick into. How many dicks have you eaten?"
    The evidence also showed that the Executive Housekeeper
8   merely laughed at such remarks and herself called one of the
    maids a "dog," "whore" and "slut."

9   *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1110-11 (9th Cir. 2000).

10          Compared to these cases, Dilettoso's failure to receive notice regarding the Peoria

11   position, the creation of the EEO Dispute Resolution letter, and the cross-examination are

12   isolated incidents that were not very severe and probably not even wrongful. The comments

13   made to Dilettoso, similarly, were not abusive in any way and were not made regularly over

14   a period of time. Unlike the "repeated" remarks in *Hacienda Hotel* and *Draper* and the

15   "relentless campaign of insults" in *Nichols*, the comments here were isolated and not

16   generally offensive. *See also Brooks v. San Mateo*, 229 F.3d 917, 921-22, 924 (9th Cir.

17   2000) (holding that coworker's placement of hands on stomach and then under plaintiff's bra

18   to fondle her bare breasts while she was on the telephone answering a 911 call was only a

19   single instance of harassment and therefore was not sufficent to predicate a claim for

20   constructive discharge).

21          Cases holding that no reasonable jury could find that a hostile work environment

22   existed are even more illustrative of the insufficiency of Dilettoso's evidenced harassment.

23   In *Kortan v. California Youth Authority*, 217 F.3d 1104 (9th Cir. 2000), for example, the

24   court held that:

25   there was no hostile work environment when a supervisor called
     female employees 'castrating bitches,' 'Madonnas,' or 'Regina' on
26   several occasions in plaintiff's presence; the supervisor called
     the plaintiff 'Medea'; the plaintiff complained about other
27

28                                          - 18 -

> difficulties with that supervisor; and the plaintiff received letters at home from the supervisor.

*Vasquez*, 349 F.3d at 643-44.  The *Kortan* court held that, "while the supervisor's language was offensive, his conduct was not severe or pervasive enough to unreasonably interfere with the plaintiff's employment." *Id.* at 644.  In *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003), similarly, the court focused on the intermittence of the employer's allegedly harrasing behavior in holding that no reasonable jury could find that Vasquez had established a hostile working environment:

> Vasquez claims that Berglund continually harasseed him but provides specific factual allegations regarding only a few instances.  The primary basis of Vasquez's claim arises from statements by Berglund that Vasquez had "a typical Hispanic macho attitude" and that he should consider transferring to the field because "Hispanics do good in the field." These statements were made more than six months apart.  Concerning Vasquez's allegation that Berglund yelled at him in front of the youth, Vasquez provides evidence of only two instances when this occurred. . . .  Finally, regarding the allegation that Berglund made continual, false complaints about Vasquez to Leeds, Vasquez offers two memos written by Berglund . . . .  All of these incidents occurred over the course of more than one year.

*Id.* at 642-43.

Here, Dilettoso alleges continual harrasment but, like the plaintiff in *Vasquez*, provides evidentiary support for only irregular and dispersed instances of conduct.  The statements made to Dilettoso, moreover, were less offensive than the statements made in either *Vasquez* or *Kortan* and bordered on mere factual disclosure or responsible employee management as opposed to harrassment.

Finally, Dilettoso submits no evidence suggesting that the incidents he alleges had "the purpose or effect of unreasonably interfering with [Dilettoso's] work performance." *Meritor Sav. Bank, FSB v. Vinson*, 447 U.S. 57, 65 (1986).  On the contrary, Dilettoso submits evidence that his "numbers" in 2003 were among his best.  (PSOF Ex. K at 4 ¶ 9.) Dilettoso has not submitted evidence from which a reasonable jury could find that he was subject to a hostile working environment.

1

2                          **3.      Causal Link**

3          The third element of the prima facie case is a causal link between the protected

4   activity and the adverse action.  Proximity of time between protected activity and an adverse

5   action may support an inference of causation.  *See Ray v. Henderson*, 217 F.3d 1234, 1244

6   (9th Cir. 2000).  However, the Ninth Circuit has cautioned that a "specified time period

7   cannot be a mechanically applied criterion.  A rule that any period over a certain time is per

8   se too long (or, conversely, a rule that any period under a certain time is per se short enough)

9   would be unrealistically simplistic." *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th

10  Cir. 2003).  "It is important to emphasize that it is causation, not temporal proximity itself,

11  that is an element of plaintiff's prima facie case, and temporal proximity merely provides an

12  evidentiary basis from which an inference can be drawn." *Porter v. Cal. Dept. of*

13  *Corrections*, 383 F.3d 1018, 1030 (9th Cir. 2004) (quoting *Kachmar v. SunGard Data Sys.,*

14  *Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)).  The Court must look not only to timing but to the

15  totality of the circumstances to determine  if an inference of causation is possible.  *See*

16  *Coszalter*, 320 F.3d at 978.

17         The court is reluctant to hold that Dilettoso has established a causal link because he

18  presents no evidence other than the proximity in time between his protected activity and the

19  adverse action, and under the circumstances of this case proximity in time indicates very little

20  about causation.  To begin with, the proximity in timing in this case was legitimately dictated

21  by external forces. *See Chen v. County of Orange*, 96 Cal. App. 4th 926, 931, 116 Cal. Rptr.

22  2d 786, 789 (App. 2002) (holding that no causal link could be inferred from proximity in

23  timing because "[plaintiff] showed nothing but a sequence [of events] in a context where

24  there were obviously good and legitimate reasons not to promote her").  The Postal Service

25  placed Dilettoso on leave in response to harassment complaints made about Dilettoso by a

26  third party.   Dilettoso had at least twice previously been alleged to have harassed

27  subordinates, and nothing in the record suggests that the Postal Service played any role in the

28                                          - 20 -

1  initiation of any of these complaints.  In light of such repeated complaints of harassment, the

2  Postal Service was under an ethical and legal obligation to perform a complete investigation,

3  which may require temporarily removing the alleged perpetrator from the workplace.  *See*

4  *Ellison v. Brady*, 924 F.2d 872, 883 (1991) ("To avoid liability under Title VII for failing to

5  remedy a hostile environment, employers may even have to remove employees from the

6  workplace if their mere presence would render the working environment hostile.").  The

7  largest subsequent extention of Dilettoso's leave, moreover, was due to a change in

8  management, a fact uncontested by Dilettoso.

9      Mere proximity in timing is also less probative here due to Dilettoso's virtually

10  continual protected conduct.  Causation evidence of this kind derives much of its

11  circumstantial force from the assumption that protected activities and adverse actions are

12  both relatively infrequent; if they occur in rapid succession, the probability of a causal or

13  other connection between them is higher.  Where an employee systematically engages in

14  protected activity, however, proximity in time will no longer effectively connote increased

15  probability of interconnectedness between the adverse action and the protected activity; any

16  adverse action will ipso facto be temporally proximate to a recent protected activity.  The

17  court is leary of attributing too much import to this form of evidence under these

18  circumstances, potentially creating thereby a "'get out of jail free' card for employees engaged

19  in job misconduct." *Brooks v. San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  As stated by

20  the court in *Chen*:

21          Consider a hypothetical of a ne'er-do-well employee who wants
           to manipulate the system to his or her advantage: "Not doing
22          your job well?   Ax about to fall?   Never fear: file a
           discrimination claim, no matter how meritless.  Your employer
23          will be afraid to take any action because now you can sue for
           retaliation."
24
    *Chen*, 96 Cal. App. 4th at 948, 116 Cal. Rptr. 2d at 803.
25
26      Whereas timing may provide the basis for an evidentiary inference in many cases, the

27  inferential value of such evidence here de minimus.  With mere temporal proximity failing

28

1   to support an inference of retaliatory motive in the circumstances of this case, Dilettoso

2   presents insufficient evidence of causation.

3   **V.   Articulated Non-Discriminatory Reason**

4         "Once the plaintiff has established a prima facie case, the burden of production

5   devolves upon the defendant to articulate some legitimate, non-retaliatory reason for the

6   adverse action." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir. 1982) (citations

7   omitted).  The main reason the government articulates for placing and keeping Dilettoso on

8   leave is that a different subordinate had previously alleged rape and sexual harassment by

9   Dilettoso, causing a need for extra certainty with respect to the current allegations.  The

10  government also articulates as non-discriminatory reasons for extending the leave Leist's

11  unsolicited allegations and the concern that Dilettoso had engaged in sexual intercourse with

12  a subordinate and lied about it during an investigation.

13  **VI.   Pretext**

14        Even assuming Dilettoso has established a prima facie case, he has nevertheless failed

15  to present sufficient evidence of pretext to survive summary judgment.   Given the

16  government's articulated reason for the adverse action, Dilettoso must present evidence that

17  raises a genuine factual question as to whether that articulated reason is pretext. *See, e.g.*,

18  *Chuang v. University of California Davis Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir.

19  2000); *Yartzoff v. Thomas*, 809 F.2d 1371, 1377 (9th Cir. 1987).  To do so, Dilettoso can

20  present direct evidence of discrimination or specific and substantial circumstantial evidence

21  of discrimination. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

22  In meeting his burden of production, Dilettoso may rely on the evidence already introduced

23  in establishing the prima facie case. *Yartzoff*, 809 F.2d at 1377.

24        **A.   Direct Evidence**

25        "Direct evidence is evidence which, if believed, proves the fact of discriminatory

26  animus *without inference or presumption*." *Aragon v. Republic Silver State Disposal*, 292

27  F.3d 654, 662 (9th Cir. 2002) (alterations, quotations, and citations omitted); *see also*

28                                                 - 22 -

1    *Godwin*, 150 F.3d at 1221 (same).  Generally, direct evidence "consists of clearly sexist,

2    racist, or similarly discriminatory statements or actions by the employer."  *Coghlan v.*

3    *American Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).  The classification as "direct"

4    evidence is important: where direct evidence is present, "a triable issue as to the actual

5    motivation of the employer is created even if the evidence is not substantial."  *Aragon*, 292

6    F.3d at 663 n.5.  By contrast, circumstantial evidence showing that the employer's proffered

7    motives were not the actual motives must be "specific" and "substantial" to create a triable

8    issue.  *Godwin*, 150 F.3d at 1222.

9         Dilettoso has provided no direct evidence of discrimination.  Dilettoso argues that the

10   Postal Service's articulated rationale – that EEO charges had been made against Dilettoso in

11   the past – could be seen as direct evidence.  (Response at 9.)  Undoubtedly, Dilettoso intends

12   to rely on the argument that an employer can violate the anti-retaliation provisions of Title

13   VII by retaliating based on "the employee's participation in the machinery set up by Title VII

14   to enforce its provisions."  *Hashimoto v. Dalton*, 118 F.3d 671, 680 (9th Cir. 1997) (citations

15   omitted).  The Postal Service has not relied, however, on Dilettoso's participation in the Title

16   VII machinery as its articulated rationale but rather on the fact that allegations were made

17   against Dilettoso raising serious questions.  Allegations made against Dilettoso in the past

18   would constitute a valid business reason for additional concern, and the Postal Service's

19   reliance thereon in no way suggests discrimination, let alone direct discrimination.

20        **B.    Circumstantial Evidence**

21        "To show pretext using circumstantial evidence, a plaintiff must put forward specific

22   and substantial evidence challenging the credibility of the employer's motives."  *Vasquez v.*

23   *County of Los Angeles*, 349 F.3d 634, (9th Cir. 2003) (footnote omitted); *accord Stegall v.*

24   *Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).  Dilettoso "may establish pretext

25   through evidence showing that [the employer's] explanation is unworthy of belief or through

26   evidence showing that discrimination more likely motivated its decision."  *Pottenger v.*

27   *Potlach Corp.*, 329 F.3d 740, 746 (9th Cir. 2003); *Nidds v. Schindler Elevator Corp.*, 113

28

F.3d 912, 918 (9th Cir. 1996) (noting that a plaintiff can show a factual question as to pretext "in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer). "These two approaches are not exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so as to make summary judgment improper." *Chuang v. University of California Davis Bd. of Trustees*, 225 F.3d 1115, 1126 (9th Cir. 2000); *see also Pottenger*, 329 F.3d at 746 ("[Plaintiff] need not rely on only one type of evidence, and he has offered evidence both to cast doubt on [defendant's] credibility and to show a discriminatory motive."). Abnormalities in the employer's handling of a complaint against its employee may be circumstantial evidence of discrimination. *Calmat Co. v. U.S. Dep't of Labor*, 364 F.3d 1117, 1122-23 (9th Cir. 2004) (upholding finding of illegal motivation given an unusually severe reaction to a complaint by an employer, including suspension without pay where other complaints had been treated less severely).

To show pretext Dilettoso submits evidence of (1) procedural irregularities behind the decisions to place Dilettoso on leave and extend that leave and (2) inconsistent rationales provided by Postal Service superiors for those decisions. The court first addresses Dilettoso's evidence of procedural irregularity and then discusses his evidence of inconsistent rationales provided for the decisions.

### 1.    Procedural Irregularities

Dilettoso alleges procedural irregularities behind the decisions to extend the investigation of his alleged sexual harassment and in the creation of a list of complaints concerning Dilettoso. The court addresses the three extensions of the investigation first and then the complaint list.

### i.    Extensions Of Investigation

Dilettoso submits as evidence of retaliation alleged procedural irregularities surrounding three extensions of the investigation into his alleged sexual harassment of Ms.

1   Lopez.  The investigation was extended (1) after Carey completed the initial management

2   inquiry, (2) after Murrietta Penn and Andy Graves finished their "fact finding," and (3) after

3   Pacific Area concluded its investigation and submitted its final report.

4           Dilettoso first asserts that the "management inquiry" conducted by Carey customarily

5   would dispose of sexual harassment claims such as those alleged against Dilettoso.

6   (Response at 3.)  Dilettoso has submitted no evidence, however, in support of this assertion.

7   (*See* PSOF Ex. D at 14 (cited in PSOF at ¶ 8).)

8           Second, Dilettoso asserts that the "fact finding" by Penn and Graves exonerated him,

9   implying that continued investigation thereafter was suspicious.  (Response at 3-4.)  Again,

10  though, Dilettoso's citations provide no supporting evidence for this assertion.  (*See* CSOF

11  at ¶ 53 (cited in PSOF at ¶ 11); PSOF Ex. D at 20, 31 (cited in PSOF at ¶ 11); DSOF Ex. 33

12  (cited in PSOF at ¶ 12).)

13          With respect to the "fact finding," Dilettoso also presents testimony by Harris that in

14  the ordinary course of events, Garrison would receive the "fact finding" report and would

15  thereafter schedule a meeting with Harris to make a decision on the report.  (DSOF Ex. 12

16  at 21:13-22.)  Here, Garrison received the "fact finding" report on February 27, 2003,

17  between one and two months before Harris's retirement, but never scheduled a meeting.[5]

18          The third extension allegedly beset by procedural irregularity was a delay in bringing

19  Dilettoso back to work following the Pacific Area investigation, which was completed as of

20  March 28, 2003.  (Response at 4.)

21          Dilettoso's evidence regarding these three extensions of the Postal Service's

22  investigation shows no "abnormality" that could constitute substantial circumstantial

23  evidence of discrimination.  Whatever the Postal Service's sexual harassment investigatory

24  _____

25          [5] Dilettoso argues that Harris was physically present until "late April," suggesting

26  Garrison held the report for one and one-half months, but submits no evidence in support of
    the assertion.  (*See* (absent) PSOF Ex. A at 69 (cited in PSOF at ¶ 22, which is cited in

27  Response at 4).)

28                                          - 25 -

1    policy normally may be, no comparable supervisor had been the subject of previous sexual

2    harassment complaints and a rape allegation.  *See Vasquez v. County of Los Angeles*, 349

3    F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated when they have similar

4    jobs *and display similar conduct*." (footnote omitted) (emphasis added)).   Dilettoso's

5    attempted comparisons with the treatment that Ms. Lopez received are especially misguided

6    in this regard.  *See id.* ("Employees in supervisory postitions are generally deemed not to be

7    similarly situated to lower level employees." (footnote omitted)).

8         Moreover, as a general matter the extent of an employer's investigation is a business

9    judgment, with no maximum limitation imposed by law.  *See McDonnell v. Cisneros*, 84 F.3d

10   256, 261 (7th Cir. 1996) (refusing to interpret the law in a way that would punish employers

11   for undertaking serious investigations into sexual harassment claims, even when such an

12   investigation "oversteps the proper bounds"); *Malik v. Carrier Corp.*, 202 F.3d 97, 106 (2nd

13   Cir. 2000) (noting that the employer's duty to investigate harassment complaints is not

14   subordinated even to the victim's desire to let the matter drop).  Considering the potential for

15   liability faced by the Postal Service based on Dilettoso's alleged recurrent harassment of

16   subordinate employees, the extensive investigation here raises no red flag.  *See, e.g.*, *Ellison

17   v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991) (noting that failure to "take into account the need

18   to maintain a harassment-free working environment may subject the employer to suit by the

19   EEOC"); *Jansen v. Packaging Corp. of Am.*, 123 F.3d 490, 493 (7th Cir. 1997) ("[T]he entire

20   court agrees that an employer who is negligent in the hiring, supervision, *monitoring, or

21   retention of the plaintiff's supervisor*[] is liable for the supervisor's sexual harassment . . . ."

22   (emphasis added)); *Malik*, 202 F.3d at 104 (noting that allegations of harassment trigger

23   federal law and an attendant duty imposed upon employers to take reasonable steps to correct

24   harassing behavior).

25         The evidence also is fully explained by the circumstances and does not provoke

26   suspicion of unlawful discrimination.  Leist's written submissions would reasonably convince

27   Garrison that additional investigation into Dilettoso's interaction with Leist was needed.  (*See*

28                                             - 26 -

DSOF Ex. 23-40; Ex. 33 at 292.)  The fact that Garrison had engaged Pacific Area to undertake such further investigation, in turn, explains why Garrison would be ill-advised to schedule a meeting with Harris at that time.  Garrison's decision to wait until the supplemental investigation was completed and to meet with Diperi was quite reasonable, given that further information would be available at that time and Diperi would be more interested in the decision than Harris; unlike Harris, Diperi would be present in the future to experience the results of the decision.  Finally, Dilettoso does not dispute that the replacement for Harris, Mr. Diperi, was overwhelmed with his new job and did not meet with Garrison to discuss what to do about Dilettoso until June. (DSOF Ex. 14 at 9:15-22; Ex. 14 at 12:16-25, 13:1.)  At that point, Diperi felt that the evidence did not support a finding that Dilettoso was guilty of any sexual harassment or harassment against Leist but was concerned that Dilettoso had engaged in sexual intercourse with a lower ranking employee and lied about it during the investigation. (DSOF at ¶¶ 58-59; Ex. 14 at 17:4-18:7.)  Diperi decided that he desired further investigation on that issue, which was concluded in September. (*See* DSOF at ¶¶ 60-62, 65.)

### ii.    The Complaint List

Dilettoso submits that during the investigation, Garrison directed a list of all complaints concerning Dilettoso be compiled and analyzed and that no evidence exists that such a document was ever created on anyone else.  (Response at 5.)  Dilettoso's argument with regard to this "procedural irregularity" misapprehends the burden of proof at this stage of the case.  It is Dilettoso's burden to provide specific and substantial evidence of pretext.  Dilettoso fails to submit evidence that this type of compilation was never created on anyone else.

### 2.    Inconsistent Testimony

Dilettoso argues that various testimonial inconsistencies show the Postal Service's articulated rationale is pretextual.  Dilettoso points to alleged inconsistencies in Postal Service officials' explanations of (1) who made the decision to place Dilettoso on

- 27 -

administrative leave; (2) why the decision to place Dilettoso on administrative leave was made; and (3) why Pacific Area was brought in to perform an investigation.

### i.    Who Made The Decision

Dilettoso first suggests that the testimony about who decided to place Dilettoso on leave is inconsistent.  Dave Carey testified that:

> I felt that highly unusual that I was not informed of the reasons why I had to take Dave [Dilettoso] off of work.  I was flustered to the point that I tried to – I had no idea why, when I had to take Dave [Dilettoso] off work, I had no idea why I was doing it except that based – the response that Mr. Harris gave was the legal department –

(PSOF Ex. B at 70:19-25.)  Mr. Harris testified that he did not remember telling Carey that the decision had been made by the legal department.  (PSOF Ex. E at 55:7-10.)  Rather, Mr. Harris testified that he told Carey that he and Garrison had made the decision.  (PSOF Ex. E. at 55:11-14.)

This evidence contains no clear inconsistency.  Carey testified that Mr. Harris gave the "legal department" as a reason for "why" Dilettoso was being placed on leave, not as an answer to the question of "who" had made the decision.  Concerns of the legal department are consistent with Harris' decisionmaking authority, not an ouster of that authority.

The decision, moreover, not to inform Carey of why Dilettoso was being placed on leave does not inherently suggest the decision was based on an illegitimate motive, and Dilettoso has not argued otherwise.  Because informational flow during the investigation of a dispute between employees is surely within the "traditional management prerogatives" not intended to be diminished by Title VII, *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 259 (1981), and because Supreme Court doctrine has generally "stressed the importance of avoiding second-guessing" employer decisions and preserving "employers' remaining freedom of choice," *Univ. of Pa. v. EEOC*, 493 U.S. 182, 199 (1990), the court will not here unilaterally raise an issue not argued by Dilettoso in his opposition to this motion.

- 28 -

1

### ii.     Why The Decision Was Made

2        Second, Dilettoso argues that inconsistent rationales were given for why Dilettoso was

3  placed on leave.  Mr. Harris's affidavit states that Dilettoso was placed on leave for sexual

4  harassment.  (PSOF Ex. W at 252.)  Garrison testified that the "[o]ut of the sexual harassment

5  investigation came allegations by Michael Leist against Mr. Dilettoso, and before this whole

6  thing could be finalized, that investigation had to take place."  (PSOF Ex. D at 23:4-7.)

7        The court perceives no incongruity.  Different but consistent reasons underlying

8  employer action will not give rise to an inference of pretext.  *See Aragon v. Republic Silver*

9  *State Disposal*, 292 F.3d 654, 661 (9th Cir. 2002) ("We do not infer pretext from the simple

10  fact that [an employer] has two different, although consistent, reasons for laying off [an

11  employee].");  *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996) (holding

12  that different employer justifications for adverse action did not raise a genuine issue of

13  material fact given that the different justifications were "not incompatible").  Mr. Harris's

14  testimony refers to why the investigation was initiated, whereas Garrison's testimony refers

15  to why the investigation was extended.  The evidence thus creates no inference of pretext.

16

### iii.    Why Pacific Area Continued The Investigation

17        Third, Dilettoso argues that the reasons given for why Pacific Area performed an

18  investigation were inconsistent.  Garrison testified that Pacific Area was brought in due to

19  a concern about witness tampering.  (Response at 4; PSOF at ¶¶ 13, 35.)  Garrison explained

20  that by "witness tampering" he meant Dilettoso's "attempt[s] to intimidate Mr. Leist so that

21  he would either be fired or so that he couldn't testify."  (PSOF Ex. D at 23:16-23.)  Dilettoso

22  argues that Garrison's testimony is contradicted by a Pacific Area "memoranda," but submits

23  no such memoranda into evidence.  (*See* PSOF at ¶ 35.)

24        The court has found a memoranda from Pacific Area in the government's evidentiary

25  submission, but that memoranda does not contradict Garrison's testimony as to why Pacific

26  Area was brought in.  (*See* PSOF at ¶ 12 (citing DSOF Ex. 33).)  The court assumes that

27  Dilettoso seeks to reference the memoranda title page.  That page, however, suggests only

28

that Pacific Area conducted a "supplemental investigation" of the "Sexual Harassment Complaints of Michael Leist, Dave Delittoso (sic) and Ramona Lopez."  (DSOF Ex. 33 at 292.)  While "sexual harassment complaints" is a broader investigatory theme than "witness tampering," Garrison's more narrow concern about the alleged intimidation of Leist by Dilettoso could have easily provided the motivation for the supplemental investigation, and a report entitled "supplemental investigation" could easily be focused on this narrower concern.  The evidence thus contains no "inconsistency" so as to cast doubt on the credibility of the Postal Service's articulated rationales.

### 3. Dilettoso Has Not Submitted Specific And Substantial Circumstantial Evidence Of Discrimination

Dilettoso's evidence does not compare favorably to cases holding that procedural irregularity or testimonial incongruity sufficed to show pretext through circumstantial evidence.  In *Porter v. California Department of Corrections*, 419 F.3d 885, (9th Cir. 2005), for example, the court held that process irregularities permitted an inference of pretext.  *Id.* at 896.  The plaintiff in *Porter* had been singled out for negative treatment by DeSantis after the plaintiff rebuffed DeSantis's repeated sexual advances and made a veiled threat to tell DeSantis's wife about the advances.  *Id.* at 888-89.  When plaintiff filed for a new assignment, DeSantis told her there were none available even though the master list showed otherwise.  *Id.* at 89.  DeSantis made clear to plaintiff that jobs otherwise open were not open "for her."  *Id.* (emphasis omitted).  When the plaintiff filed an EEO complaint, the employer agreed to place a non-local investigator on the case but then assigned a local officer and became angry and scolded plaintiff when plaintiff sought to rectify the issue.  *Id.* at 890.  After plaintiff was told not to come onto the employer grounds for a period of time she was punished for complying with that mandate.  *Id.*  Finally, the employer directed plaintiff to only use the back gate when entering work, despite the fact that the employees in the office would frequently hang up on her and not buzz her in.  *Id.*

1       Unlike the process irregularities in *Porter*, the procedural "irregularities" alleged by

2   Dilettoso were not irrational and did not inherently evince employer hostility.  In *Porter*,

3   DeSantis irrationally denied the plaintiff new assignments, and the plaintiff was irrationally

4   punished for complying with the employer's requests.  Performing an extensive investigation

5   of new sexual harassment charges and other uncovered charges, by contrast, which were

6   made against an employee formerly charged with sexual harassment and rape, can in no way

7   be considered irrational.  Administrative leave with pay, moreover, does not tend to suggest

8   employer antipathy.  The plaintiff in *Porter* was relegated to using a back door, deprived of

9   assignments *for being herself*, and was scolded angrily for attempting to correct the

10  employer's oversight.  Here, although paid leave constitutes an adverse employment action,

11  as a general matter paid leave is more analogous to vacation "time off" than punishment.

12  Unlike the irregularities extant in *Porter*, under Dilettoso's circumstances the evidence

13  submitted does not cast doubt on the legitimacy of the employer's motives.

14      *Strother v. Southern California Permanente Medical Group*, 79 F.3d 859 (9th Cir.

15  1996), provides an example of the type of testimonial incongruity that could give rise to a

16  finding of pretext.  In *Strother*, the defendant's explanation for its decisions was in part that

17  Stother had poor interpersonal skills.  *Id.* at 870.  The plaintiff, however, produced a letter

18  written previously by the decisionmaker stating that plaintiff was "well respected and literally

19  able to get along in any situation with anyone," along with other letters to the same effect

20  written by other members of the partnership.  *Id.*  Although the decisionmaker testified that

21  the letter was untrue and signed with the hope that plaintiff would leave the office for a

22  different position, the court determined that the evidence cast doubt on the employer's

23  articulated rationale.  *Id.* at 870-71.

24      Dilettoso's alleged testimonial incongruities, by contrast, do not cast doubt on the

25  Postal Service's articulated rationales for extending his administrative leave.  Even if the

26  testimony cited by Dilettoso were inconsistent, which it is not, unlike the evidence in

27

28                                         - 31 -

1    *Strother* the different reasons given for the extensions of Dilettoso's leave could coexist

2    harmoniously.

3         For instance, the investigation was originally based on sexual harassment allegations.

4    Even assuming that Pacific Area entered the picture for the purpose of performing a full

5    sexual harassment investigation – although Garrison stated the reason was merely a concern

6    over "witness tampering" – Garrison's more precise rationale was a subsidiary issue arising

7    out of the sexual harassment investigation.  As opposed to the letter in *Strother*, which could

8    only coexist with the other evidence when explained as a deception or misrepresentation, the

9    disparate suggestions as to why Pacific Area was brought in may be attributed to viewing the

10   investigation from different levels of generality.

11        Similarly, discrepancy as to who made the decision to place Dilettoso on leave is

12   largely irrelevant to the issue of why the decision was made.  Unlike the letter in *Strother*,

13   which directly draws into question the worthiness of belief of the employer's articulated

14   motivation, incongruous explanations of who made the decision to place Dilettoso on leave

15   could at best cast doubt on the believability of the employer as an abstract proposition as

16   opposed to engendering friction with the articulated rationale.  Permitting these kinds of

17   remote testimonial discrepancies to constitute specific and substantial evidence of

18   discrimination, especially when the adverse action is "excessive" investigation of a sexual

19   harassment complaint, would be incompatible with the law's concern to soothe the "worry

20   that employers will be paralyzed into inaction once an employee has lodged a complaint

21   under Title VII."  *Brooks v. San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

22        In summary, the circumstances Dilettoso points to as indicating retaliatory purpose

23   are entirely consistent with diligent and good faith investigations of serious and evolving

24   EEO charges against a senior manager.  One must have more than that to defeat summary

25   judgment.  While the court is well aware of "the reluctance of this Circuit to allow summary

26   judgment" in employment discrimination cases,  *Schnidrig v. Columbia Machine, Inc.*, 80

27   F.3d 1406, 1411 (9th Cir. 1996), in this case there are "no indications of motive and intent,

28

1   supportive of [plaintiff's] position, to put on the scales for weighing." *Id.* (internal citations

2   omitted).   Dilettoso labors to find "procedural irregularities" and testimonial

3   "inconsistencies" but fails to provide any specific and substantial evidence calling the

4   government's articulated justification into doubt.  The government is therefore entitled to

5   summary judgment under a single-motive analysis.

6   **VII.   Mixed Motives**

7       Cases where employer action is motivated by a combination of legitimate and

8   illegitimate motives are referred to as "mixed-motive" cases. *Stegall v. Citadel Broad. Co.*,

9   350 F.3d 1061, 1067 (9th Cir. 2004).  Here, as discussed above, Dilettoso summarily asserts,

10  though he does not explain, a mixed-motive theory in opposition to the government's motion

11  for summary judgment.  (Response at 15:10-15.)

12      **A.   Applicable Law**

13      The Supreme Court originally articulated the burden-shifting framework for mixed-

14  motive Title VII cases in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).  Although the

15  Court issued no majority opinion in *Price Waterhouse*, five Justices agreed that where a

16  plaintiff carries his or her burden to show that an illegitimate motive "played a motivating

17  part in an employment decision, the defendant may avoid a finding of liability only by

18  proving that it would have made the same decision even if it had not allowed gender to play

19  such a role." *Id.* at 244-45 (plurality opinion); *Id.* at 260 (White, J., concurring) ("The burden

20  of persuasion then should have shifted to [defendant] to prove . . . that it would have reached

21  the same decision in the absence of the unlawful motive." (citations and internal quotations

22  omitted)); *Id.* at 279 (O'Connor, J., concurring) ("I agree with the plurality . . . .  On remand,

23  the District Court should determine whether Price Waterhouse has shown . . . that if gender

24  had not been part of the process, its employment decision . . . would nonetheless have been

25  the same."). *Price Waterhouse* thus established a full affirmative defense for employers who

26  could prove that the same decision would have been made regardless of the impermissible

27  discrimination.

28

1     "The Civil Rights Act of 1991 modified the Supreme Court's holding in *Price*

2  *Waterhouse* as to when a plaintiff is entitled to relief in a mixed motive case." *Washington*

3  *v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1993).  However, the Civil Rights Act of 1991 did

4  not, explicitly at least, alter the law of mixed motives for cases where the illegitimate motive

5  alleged is retaliation.  As codified, the relevant portions of that Civil Rights Act of 1991 are

6  42 U.S.C. § 2000e-2(m) and § 2000e-5(g)(2)(B).  Section 2000e-2(m) states:

7

8              **(m) Impermissible consideration of race, color, religion, sex,
               or national origin in employment practices**  Except as
               otherwise provided . . ., an unlawful employment practice is
               established when the complaining party demonstrates that race,
9              color, religion, sex, or national origin was a motivating factor
               for any employment practice, even though other factors also
10             motivated the practice.

11  Section 2000e-5(g)(2)(B) applies only to unlawful employment practices established through

12  § 2000e-2(m), and states:

13

14             **(B)** On a claim in which an individual proves a violation under
               section 703(m) [42 U.S.C. § 2000e-2(m)] and a respondent
15             demonstrates that the respondent would have taken the same
               action in the absence of the impermissible motivating factor, the
16             court–
                    (i) may grant declaratory relief, injunctive relief (except
17                  as provided in clause (ii)), and attorney's fees and costs
                    demonstrated to be directly attributable only to the
18                  pursuit of a claim under 703(m) [42 U.S.C. § 2000e-
                    2(m)]; and
19                  (ii) shall not award damages or issue an order requiring
                    any admission, reinstatement, hiring, promotion, or
20                  payment . . . .

21  The Civil Rights Act of 1991 thus turned *Price Waterhouse*'s full affirmative defense into a

22  partial affirmative defense limiting the scope of remedies available.  *Desert Palace, Inc. v.*

23  *Costa*, 539 U.S. 90, 94 (2003).  But it did so only for discrimination based on race, color,

24  religion, sex, and national origin, without explicitly addressing retaliatory discrimination.

25        For mixed-motive retaliation claims, therefore, courts continue to refer to *Price*

26  *Waterhouse*.  *See McNutt v. Bd. of Trustees*, 141 F.3d 706, 708-709 (7th Cir. 1998) (holding

27  that 42 U.S.C. § 2000e-2(m) and therefore § 2000-5(g)(2)(B) did not apply to retaliation

28                                            - 34 -

1  claims, despite prior Seventh Circuit authority that had assumed those provisions'

2  applicability to retaliation cases without deciding or anaylzing the issue); *Pennington v.*

3  *Huntsville*, 261 F.3d 1262, 1269 (11th Cir. 1262) ("We stated that the 1991 Act overruled

4  and limited the mixed-motive defense only in discrimination cases based on race, color,

5  religion, sex and national origin, but left the defense intact for retaliation claims."); *Matima*

6  *v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) ("[A]ll of our sister circuits to have considered the

7  issue have concluded that 42 U.S.C. § 2000e-5(g)(2)(B) does not apply to mixed motive

8  retaliation findings, and that a mixed motive finding acts as a complete bar to a retaliation

9  claim, precluding any and all relief.  We agree." (internal citations omitted)); *Woodson v.*

10  *Scott Paper Co.*, 109 F.3d 913, 932-35 (3d Cir. 1997); *Tanca v. Nordberg*, 98 F.3d 680, 682-

11  85 (1st Cir. 1996); *Kubicko v. Ogden Logistics Servs.*, 181 F.3d 544, 552 n.7 (4th Cir. 1999);

12  *Norbeck v. Basin Elec. Power Corp.*, 215 F.3d 848, 852 (8th Cir. 2000).  Although the court

13  finds no Ninth Circuit case specifically analyzing the inapplicability of § 2000e-5(g)(2)(B),

14  at least one post-1991 Ninth Circuit case has applied *Price Waterhouse* in analyzing a mixed-

15  motive retaliation claim.  *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1067-68 (9th Cir.

16  2004).  The court therefore applies the framework of *Price Waterhouse* to Dilettoso's mixed

17  motive claim.

18  **B.    Burden Of Proof On Summary Judgment**

19      The standards of proof and persuasion applicable to mixed-motive retaliation claims

20  have not been definitively established.   To begin, the three-Justice dissent in *Price*

21  *Waterhouse* characterized the holding of that case as follows:

22
23          I read the opinions as establishing that in a limited number of
           cases Title VII plaintiffs, by presenting direct and substantial
24          evidence of discriminatory animus, may shift the burden of
           persuasion to the defendant to show that an adverse employment
25          decision would have been supported by legitimate reasons. *The*
           *shift in the burden of persuasion occurs only where a plaintiff*
26          *proves by direct evidence that an unlawful motive was a*
           *substantial factor* actually relied upon in making the decision.

27
28                                          - 35 -

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 280 (1989) (citations omitted) (Kennedy, J., dissenting) (emphasis added). It is not entirely clear, however, that the aggregated opinions in Price Waterhouse held so broadly. Although Justice O'Connor's concurrence set out the burden-shifting nuances cited by the dissent, *id.* at 276 (O'Connor, J., concurring), Justice White's concurrence made no mention of "direct" evidence and only specified that the plaintiff needed to show that the unlawful motive was a "substantial factor" in the adverse employment action in order to shift the burden of persuasion. *Id.* at 259-60 (White, J., concurring). The four-Justice plurality did not specify any detailed burden placed upon the plaintiff to shift the burden of persuasion, positing only that the burden shifted "once a plaintiff in a Title VII case shows that gender played a motivating part in an employment decision." *Id.* at 244-45 (plurality opinion). Nevertheless, in the aftermath of *Price Waterhouse*, which was decided in 1989, a number of the circuits held plaintiffs must submit direct evidence of discrimination in order to obtain a mixed-motive charge. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 91 (2003) (citing cases).

In 2003 the Supreme Court in *Costa* addressed the narrow issue of whether direct evidence was required to establish liability for sex discrimination under the Civil Rights Act of 1991, 42 U.S.C. § 2000e-5(g)(2)(B). *See id.* at 98. The Court expressly declined to address the issue of which opinion in *Price Waterhouse* was controlling, "primarily" because the statutory text of § 2000e-5(g)(2)(B) did not provide any basis for requiring plaintiffs to meet a heightened burden. *Id.* Notwithstanding the Court's narrow statutory holding, the Court's opinion could shed light on the appropriateness of a heightened evidentiary burden of persuasion in retaliation cases. First, the Court emphasized that the text of the 1991 Act did not indicate that any "special evidentiary showing" was required. *Id.* at 99. Neither, of course, does Title 42's retaliation provision. *See* 42 U.S.C. § 2000e-3(a). Second, the Court recognized the adequacy of circumstantial evidence in general, noting that "[w]e have often acknowledged the utility of circumstantial evidence in discrimination cases," that "we have never questioned the sufficiency of circumstantial evidence in support of a criminal

1    conviction, even though proof beyond a reasonable doubt is required." The Court concluded:

2    "It is not surprising, therefore, that neither the petitioner nor its *amici curiae* can point to any

3    other circumstance in which we have restricted a litigant to the presentation of direct

4    evidence absent some affirmative directive in a statute." *Id.* at 99-100.

5          Despite the Supreme Court's intimations, at least one district court in this circuit has

6    followed Fourth Circuit pre-*Costa* precedent which saddles the plaintiff with the requirement

7    of providing direct evidence of retaliatory discrimination in order to obtain a mixed-motive

8    instruction. *Funai v. Brownlee*, 369 F. Supp. 2d 1222, 1228 (D. Haw. 2004). Ninth Circuit

9    precedent, however, strongly suggests that direct evidence is unnecessary in this regard.

10   Most prominent is *Stegall v. Citadel Broadcasting Company*, 350 F.3d 1061 (9th Cir. 2004),

11   which applied *Price Waterhouse* to a mixed-motive retaliation claim and described the

12   burden allocation as follows:

13                  Under *Price Waterhouse*, *the plaintiff must show that it is more
                    likely than not* that a protected characteristic played a motivating
14                  part in the employment decision. Once that is done, the
                    employer may escape liability only by proving by way of an
15                  affirmative defense that the employment decision would have
                    been the same even if the characteristic had played no role.

16   *Id.* at 1068 (citations, alterations and internal quotations omitted) (emphasis added); *see also*

17   *id.* at 1072 ("[The evidence] reveal[s] that [plaintiff's] protected activity was *most likely* a

18   motivating factor in her termination." (internal quotations omitted) (emphasis added)). Dicta

19   in another Ninth Circuit case confirms that direct evidence of discrimination is not necessary

20   to invoke a mixed-motive framework in a retaliation case. *See Calmat Co. v. U.S. Dep't of

21   Labor*, 364 F.3d 1117, 1123 n.4 (9th Cir. 2004). Rounding out the authority against

22   requiring direct evidence, a third Ninth Circuit case has extended the ambit of *Costa*, albeit

23   on a different issue, to other discriminatory motives not explicitly mentioned in 42 U.S.C.

24   § 2000e-2(m). *Head v. Glacier Northwest, Inc.*, 413 F.3d 1053, 1065 n.67, (9th Cir. 2004)

25   (holding that "*Costa*, though a Title VII case, applies equally in the ADA context," and

26   importing mixed-motive causation into ADA analysis). The Ninth Circuit authority

27

28                                              - 37 -

forcefully suggests that direct evidence is not required in order to obtain a mixed-motive retaliation instruction.

### C.    Dilettoso Fails To Present Evidence Establishing A Triable Issue As To Mixed Motive

Dilettoso has not submitted evidence sufficient to create a triable issue as to whether a protected characteristic more likely than not played a motivating part in the employment decision.[6]  The court therefore need not reach the government's contention that even if illegitimate motivation were found, a reasonable jury could only find that the adverse action would nevertheless have occurred.  (*See* Reply at 10:5-8.)

The only evidence Dilettoso has presented arguably indicative of illegitimate employer motivation is the proximity in time between his protected activity and the adverse employment action.   The insufficiency of any such inference of motivation in the circumstances of this case has been discussed above.   The defendant is also entitled to summary judgment under a mixed motive analysis even assuming plaintiff has raised that issue sufficiently to require a decision.

**IT IS THEREFORE ORDERED** that plaintiff's Motion To Strike (doc. # 49) is denied.

**IT IS FURTHER ORDERED** that defendant's Motion For Summary Judgment Or Partial Summary Judgment (doc. # 34) is granted.

**IT IS FURTHER ORDERED** that defendant's Motion Requesting A Settlement Conference (doc. # 51) is denied as moot.

. . .

. . .

. . .

---

[6] As discussed in the section of the court's opinion on pretext, Dilettoso has not submitted direct evidence of retaliatory discrimination either.  If direct evidence were required, of course, the disposition on the motion for summary judgment would be the same.

1    **IT IS FURTHER ORDERED** that the clerk enter judgment in favor of Defendant

2   John E. Potter, Postmaster General, and that Plaintiff David Dilettoso take nothing on his

3   complaint.  The clerk is directed to terminate this action.

4       DATED this 25th day of January 2006.

5

6

7   _____

8   Neil V. Wake
    United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

INDEX

2  I. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

3  II. Plaintiff's Motion To Strike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4          A. Motion To Strike Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

5                1. Exhibits 6, 7, 8, 42 And 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

6                2. Exhibits 24-30 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7          B. Motion To Strike Arguments And Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

8                1. Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

9                2. Reply Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

10 III. Analysis And Burdens In Title VII Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

11 IV. Prima Facie Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

12          A. Protected Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

13          B. Adverse Employment Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

14                1. Discrete Acts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

15                      i. Dilettoso's Placement On Paid Administrative Leave And
16                         Continuation Of That Leave . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

17                      ii. Creating And Circulating Documents Containing Allegedly
                          "Slanderous" Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

18                      iii. Dilettoso Was Not Informed That He Was Passed Up For The
19                          Peoria Postmaster Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

20                      iv. Impeachment Of Dilettoso While Testifying . . . . . . . . . . . . . . 15

                        v. Dilettoso's Supervisor Shunned Him . . . . . . . . . . . . . . . . . . . . . 15
21
                2. Non-Discrete Acts And Hostile Working Environment . . . . . . . . . . . . 16
22
                3. Causal Link . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
23
    V. Articulated Non-Discriminatory Reason . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
24
    VI. Pretext . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
25
          A. Direct Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
26
          B. Circumstantial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
27

28

1. Procedural Irregularities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

i. Extensions Of Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ii. The Complaint List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2. Inconsistent Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i. Who Made The Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

ii. Why The Decision Was Made . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

iii. Why Pacific Area Continued The Investigation . . . . . . . . . . . . 29

3. Dilettoso Has Not Submitted Specific And Substantial Circumstantial
Evidence Of Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VII. Mixed Motives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

A. Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. Burden Of Proof On Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

C. Dilettoso Fails To Present Evidence Establishing A Triable Issue As To
Mixed Motive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38